OPINION
{¶ 1} Plaintiff-appellant, John Michael Schechter, M.D. ("appellant"), appeals the judgment of the Franklin County Court of Common Pleas affirming the order of defendant-appellee, State Medical Board of Ohio ("the board"), in which the board permanently revoked appellant's license to practice medicine in the State of Ohio.
 {¶ 2} Appellant asserts the following two assignments of error for our review:
First Assignment of Error:
The board's order is not supported by the requisite quantum of reliable, probative, and substantial evidence and is contrary to law as it is based upon false evidence.
Second Assignment of Error:
The board's order is contrary to law because it provides discipline that is grossly excessive to the established procedures and discipline in similar cases such that it is violative of due process and arbitrary, unreasonable and capricious.
 {¶ 3} The following facts are taken from the report of the hearing examiner, the transcript of testimony given at the hearing, and the exhibits admitted into the record. Appellant received his medical degree in 1989 from the Ohio State University College of Medicine. In 1993, he completed a psychiatry residency at the University Hospitals at Case Western Reserve University College of Medicine in Cleveland, Ohio. Thereafter, appellant served as an attending psychiatrist at St. Luke's Medical Center in Cleveland. In 2000, appellant accepted a position as a geriatric psychiatrist at Community Support Services in Akron, Ohio. He also maintained a private practice in Solon, Ohio, which he closed in 2002.
 {¶ 4} At the time of the hearing, appellant maintained employment with Community Support Services and also worked as an Assistant Clinical Professor of Psychiatry at Northeastern Ohio University College of Medicine and at Case Western Reserve University College of Medicine. Appellant is certified by the American Board of Psychiatry and Neurology.
 {¶ 5} By letter dated May 14, 2003, the board notified appellant that it intended to take action against his license to practice medicine based upon the following allegations:
(1) In the routine course of your practice, you undertook the treatment of Patient 1, identified on the attached Patient Key, which is confidential and to be withheld from public disclosure. You began treating Patient 1 in 1996 on referral from her psychologist for elements of mood disorder and difficulties associated with childhood sexual abuse. You initially diagnosed Patient 1 with Cyclothymia, hypomanic, and later changed her diagnosis to Bipolar Disorder. During the time she was your patient, Patient 1 was hospitalized twice for psychiatric decompensation, and was hospitalized once following your treatment of her.
(2) During the course of her treatment with you, Patient 1 reported to you that she had a history of sexual abuse, self-mutilation, and problems with her marriage. After beginning treatment with you, Patient 1 declared her love for you, expressing feelings of sexual attraction and becoming increasingly flirtatious and provocative. During your psychiatric sessions with Patient 1, you allowed Patient 1 to expose herself to you, listened to her sexual fantasies involving you, and allowed her to rub her genitals in your presence.
(3) In or about the year 1999, in your office during a psychiatric session with Patient 1, while Patient 1 was exposing her panties to you, you touched Patient 1's panties. On or about April 17, 2000, in your office during a psychiatric session with Patient 1, you engaged in sexual relations with Patient 1.
(4) Following sexual relations with Patient 1, you continued to treat her as your psychiatric patient for approximately two more years, although your behavior toward Patient 1 was dictated by fear that if you angered her, she would disclose your sexual activities with her. During this time and/or shortly following your termination of Patient 1 as your psychiatric patient, you inappropriately discussed your personal feelings with Patient 1, and discussed the consequences of her revealing your conduct, including that you would deny any sexual activity occurred. At some point following sexual relations with Patient 1, and during the time she was under your care as a psychiatric patient, you slapped Patient 1 in the face.
(State's Exhibit 1-A.)
 {¶ 6} The board charged that the foregoing conduct constituted a violation of R.C. 4731.22(B)(6) because it represented "[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not injury to a patient is established." Further, the board charged appellant with violating R.C. 4731.22(B)(18), alleging that appellant's conduct constituted, "[v]iolation of any provision of a code of ethics of the American Medical Association * * *." Pursuant to R.C. Chapter 119, appellant timely requested a hearing, which was held over four days in October and December 2003.
 {¶ 7} Patient 1 lives in a town near Akron, has been married for 22 years and has two daughters. She was sexually and psychologically abused by her father over a period of 15 years during her childhood. As a result of this abuse, according to Patient 1, she had "split" into two personalities. She stated that she first sought treatment for these issues with her psychologist, Dr. McGraw, in 1990. Dr. McGraw diagnosed post-traumatic stress disorder and referred her to a psychiatrist — Dr. Peter Kontos — who diagnosed Patient 1 with bipolar affective disorder, atypical mixed.
 {¶ 8} After Dr. Kontos left the practice of medicine, Patient 1 took no medications for two years. In 1996, Dr. McGraw became concerned about Patient 1 and referred her to appellant for medication management. During her initial visit with appellant, Patient 1 reported that she had been cutting herself with a razor while shaving as a means to "feel something." She reported feeling as though there were two other people in the room with her when she cut herself. She also reported a history of alcohol abuse.
 {¶ 9} Appellant initially diagnosed Patient 1 with cyclothymia, hypomanic, and prescribed Depakote. In December 1997, appellant changed his diagnosis to bipolar disorder, depressed, and prescribed Paxil in addition to the Depakote. In February 1998, Patient 1 experienced a manic episode during which she was "decompensating at work, becoming more psychotic, [and] burning herself." She was taken to the emergency department at St. Vincent Charity Hospital and later admitted to Windsor Hospital in Chagrin Falls, Ohio.
 {¶ 10} According to Patient 1, not long after she began treating with appellant, she developed feelings of affection for him, which began to manifest themselves first through flirting and later through Patient 1 hugging appellant and telling him that she loved him. She testified that appellant told her that he was flattered. When Patient 1 inquired whether any of appellant's other patients had fallen in love with him, he responded that others had, but that none had been "as pretty" as Patient 1. According to appellant, however, he tried to impress upon her that her feelings for him were most likely a transference of feelings that she really had for someone else. Appellant characterized his efforts in this regard as unsuccessful.
 {¶ 11} According to Patient 1, after she confessed her attraction to appellant, he would sit next to her and subtly touch her hair or her leg. Patient 1 became more and more physically attracted to appellant, and he acknowledged that the attraction was mutual, but said that they could not "do anything." Patient 1 then began sharing with appellant her sexual fantasies involving him. She testified that she also gave him written sexual fantasies because appellant told her that he likes erotica.
 {¶ 12} Appellant testified that he had explained to Patient 1 that there were boundaries that must be observed during her medication management sessions, and that this meant, "You can say and do whatever you want, but you need to stay in your seat." According to Patient 1, appellant never discouraged her from sharing her fantasies and he actually encouraged her to explore them further. Eventually, Patient 1 began to act out her sexual fantasies during her sessions with appellant. She explained:
In the process of telling him a fantasy, I started touching myself, and he said, `What are you doing?' And I said, `I'm showing you what I would like you to do to me.' And I took off my bra and showed him my breasts, and he said they were perfect. And he said, `You can do anything you want in therapy. I can only watch. You can, you know, do anything. It's your dime, you know. Whatever you want to do, I can just watch, but, you know, we can't really touch.'
(Tr., 74.)
 {¶ 13} Appellant explained that he had allowed Patient 1 to disrobe and/or masturbate in his presence on approximately thirty-six occasions. (Tr., at 30, 345-346.) He testified that he asked her to stop but he did not tell her that he would end the sessions if she did not stop. He testified:
[A] more experienced or skillful psychiatrist, in handling this correctly, would have allowed her to say what she wanted, but would have been more effective at setting boundaries on her behavior, and would have been better at separating his own human responses between physician and human being, better than I was.
(Tr., 342.) He went on to explain:
I had an inability to stop her in her tracks. That was my clear incompetence, that was my first crucial mistake. I could not get her to stop. I know now that I could have gotten — If I was armed with more knowledge, I could have gotten her to stop.
(Tr., 347.)
 {¶ 14} When asked about the incident in which appellant allegedly touched her panties, Patient 1 testified:
I was — we were talking sexual. I lifted up my skirt and pulled my panties aside, and he got up and closed the blinds and came over to me and said, `Lay back,' and, like, took my shoulders and laid me back, and he knelt down next to me, and he touched my vagina, my panties were pulled aside, and said, `Do you like when I touch you there?'
And then he got up and said, `I have to stop now. I've gone farther with you than anyone else.' And he was standing right in front of me, and his erection was bulging out of his pants and put my face on there. And then he went over to the wall and stood there, and I went over. We were like hugging a little bit.
(Tr., 80).
 {¶ 15} Appellant admitted that he touched Patient 1's genitals, though he stated that he did so only over her panties. He testified that, on that day, Patient 1 had been touching herself and begging him to touch her, whereupon he "lost control" and touched her. He related that he was "horrified" at his own behavior and knew that he could lose his license to practice medicine, but he had "trouble sorting things out" after that. He stated that despite the fact that he knew that Patient 1's father had sexually abused her as a child, he struggled to treat Patient 1 effectively because his "human side was pushing through intense sexual excitement." He stated that he found it difficult to see the harm he could do to Patient 1 because of the sexual excitement he was experiencing. He acknowledged that he could have sought help from a third party but did not do so because he felt ashamed about his behavior.
 {¶ 16} Patient 1 testified that she telephoned appellant after this incident. She told him that what happened was really affecting her. She related that appellant yelled at her, shouting that he had not raped her and that he had not exposed himself to her. He told her that he could get into a lot of trouble for what had happened between them. (Tr., 80-81.)
 {¶ 17} On March 17, 1999, appellant wrote in Patient 1's records that she "still [had] poor boundaries at times." On June 20, 1999, he wrote that she was "inappropriate and extremely flirtatious at times. May be related to marital issues — urged her to work on this with Dr. McGraw." (State's Ex. 7, at 44b-46b.) Throughout the fall of 1999, appellant noted that Patient 1 was experiencing increased symptoms of depression and that she continued to be "provocative," that she "needed more redirection" and that she was "becoming more ill."
 {¶ 18} After noting, on February 16, 2000, that Patient 1's behavior had become "more appropriate," his notes indicate that he again allowed Patient 1 to stimulate herself in his presence on April 17, 2000. On that date, after watching Patient 1 touch herself, he decided to have sexual intercourse with her. He testified that he first asked her to promise not to tell anyone. When she agreed, appellant locked his office doors, after which the two engaged in sexual intercourse and fellatio.
 {¶ 19} Patient 1 also testified regarding the April 17, 2000 incident. She related that she had been sitting on the couch in appellant's office and had given him another sexually charged letter. Appellant sat on the couch next to her to read the letter. Patient 1 laid her head on his thigh while he read the letter, and he rubbed her back while he was reading. When he finished reading, he got up and went back to his chair, sat down with his groin thrusting outward, and, with a disappointed look, said, "You kept your clothes on." Patient 1 responded, "Oh you spoke too soon." She began to remove her clothes, and appellant got up and locked the office doors. When he returned to his chair, Patient 1 was simulating masturbation and appellant began to watch while holding his erection. She stood, and they started kissing and rubbing their genital areas together. Appellant told her to bend over his credenza, and when she complied he engaged in intercourse with her. He stopped shortly thereafter, and then accepted her offer of fellatio.
 {¶ 20} She testified that, afterwards, the two shared a cigarette during which appellant repeatedly stated that he was "so fucking stupid." After they finished smoking, he wrote her a prescription, walked her to the door, thanked her for "being so nice to [him]" and said, "Please don't call me tomorrow." (Tr., 84.) Patient 1 testified that she was unable to work for the week following this incident because she was obsessed with appellant and felt that she was under his control.
 {¶ 21} Appellant testified that he asked Patient 1 not to tell anyone about their sexual activities because he knew that he could lose his medical license as well as his family. He stated that, despite Patient 1's history of mental illness, he believed that their sexual encounters would be something that they would both keep private. Appellant did not place the incident in any of Patient 1's medical records. He continued to treat her, and did so, according to appellant, because he wanted to give her an opportunity to "process" the incident. He testified that he believed that, by continuing to treat Patient 1, he could help her or could at least remediate the impact of the sexual encounter that had occurred between them. He stated:
I thought I could help her understand that what happened was a mistake. I thought that she was entitled to an explanation.
And I was operating under a principle that I believed her when she said she wasn't going to tell anybody about it, and that we could — and I thought that I would be the person to help her understand the elements of human interaction that occurred, in my opinion, there was an element of accountability on both sides for the human interaction. I don't pretend that I'm not the one to blame for this, but I thought that she deserved an explanation for why I had such difficulty controlling myself.
(Tr., 367-368).
 {¶ 22} Appellant testified that, over time, he began to worry that Patient 1 would expose his behavior. She once asked him what he would do if she were to tell a third person. He responded that he would deny it, and that people would believe him and not her. On May 5, 2000, he noted in his records for Patient 1 that she "continues to declare her love for me — I attempted to redirect the patient." (State's Ex. 7, at 57a.) On March 14, 2001, he wrote that Patient 1 had told him that she was as depressed as she had ever been. He also wrote, "Symptoms of mania seem better since increase in Zyprexa and Depakote ER. Beginning to talk about voices inside of her — altered ego states." (State's Ex. 7, at 56b.)
 {¶ 23} On April 4, 2001, appellant wrote, "[Patient 1] seen; decompensating rapidly. Self mutilating, dissociating. Needs hospitalization." On April 5, 2001, Patient 1 was admitted to St. Vincent Charity Hospital. Appellant acted as her attending physician during this hospital stay. Patient 1 testified that this hospitalization was the result of her being unable to deal with her feelings for appellant. She stated that she told appellant that she felt with him the way she had felt with her father when she was a child. Appellant told her that the two relationships were significantly different. Following adjustments to her medications, Patient 1 was discharged on April 19, 2001, after which appellant continued to treat her.
 {¶ 24} Patient 1 testified regarding an incident that occurred several months later, during the summer of 2001. She had had an appointment with appellant earlier that evening, during which he stimulated himself through his clothing while she told him another erotic story. She went over to him and laid on him while he held her and leaned back in his chair. She asked him, "Why is this going on?" and he replied, "Because I wanted you and maybe I still do." The appointment ended there, and appellant had one more appointment with another patient that evening.
 {¶ 25} Patient 1 testified that she waited for appellant in the stairwell of his building until the conclusion of his last appointment because she "felt there was so much more there." When he saw her, he asked why she was there. She told him that she wanted to talk to him about the things he had said, and he invited her to return to his office. Patient 1 then became very provocative, told him she wanted him, grabbed at his groin and may have touched him there. He told her to get out and to leave him alone because she was harassing him. When Patient 1 asked him why he only wanted it when he wanted it, he responded, "What if my wife finds out?" Patient 1 continued:
And with that he hit me across the face. My earring flew out of my ear, and I bent back, and I turned around, and I said, `Why do you want to fight?' And with that he took and threw me and pushed me, and I hit a wall that was like a corner sticking out wall. My head hit that, and I fell to the ground. And he bent down and said, I was just going to call an ambulance, and then he got up. I was still on the ground in shock and pain, and he walked out, and he paused. And before he left he said, `Go ahead. Turn me in. Sue me if you have to.' And he left me there in the open offices.
(Tr., 87-88.)
 {¶ 26} Appellant's version of this incident includes testimony that Patient 1 was "out of control," speaking at a high volume, and demanding sex from him. He stated that she was very vulgar and repeatedly attempted to touch him, as a result of which he slapped her. He testified:
I had packed up all my things and was trying to leave my office, and she was grabbing me and attempting to touch me, and I probably spent fifteen minutes asking her to stop, to stop touching me and to calm down and to go home. At some point, I had in my mind sort of a movie scene where someone is out of control, and you slap them lightly. And this was a light slap on the face to get them to get a hold of themselves. I was being violated at that point. * * * She did not fall immediately. She fell — she was hit, and then she fell in sort of a melodramatic fashion. I left, and I came back a half-hour later because I wanted to make sure that she was gone and was okay, and she was gone.
(Tr., 45.) Appellant denied slapping Patient 1 out of anger.
 {¶ 27} Patient 1 testified to numerous threats that appellant made in order to discourage Patient 1 from revealing the details of their sessions:
Patient 1 testified that she had been afraid to tell anyone about the relationship between her and Dr. Schechter. She stated that Dr. Schechter had threatened her that, if she told anyone, he would never speak to her again, that he would have only hate feelings for her, and that he would not hold a special place for her in his heart. She stated that he had also threatened to kill himself. He also told her that no one would believe her over him anyway. Moreover, she stated that Dr. Schechter had threatened to ruin her by exposing her pictures and letters. Patient 1 testified that she could not tell anyone because she wanted his approval and felt that she was under his power. She stated that his threats of suicide had devastated her, and that she had almost sought hospitalization.
(Report of Hearing Examiner, at 19, citing Tr., 89-92.) Appellant admitted that he had threatened to commit suicide if Patient 1 told anyone about their relationship. He denied that this amounted to coercion of Patient 1, and described it instead as "self-disclosure" on his part. He also admitted to threatening Patient 1 with release of letters and nude photographs she had given him.
 {¶ 28} In March 2002, appellant noted in Patient 1's records that she continued to discuss her love for him and that she was poorly redirectable in that regard. On March 15, 2002, appellant called Patient 1's pharmacy and discovered that she had not taken her antipsychotic medication for the immediately preceding four months. Shortly thereafter, Patient 1 finally told Dr. McGraw about the relationship. Dr. McGraw confronted appellant and appellant denied the truth of what Patient 1 had told Dr. McGraw. Appellant instructed Dr. McGraw to note in Patient 1's records that Patient 1 was delusional.
 {¶ 29} By letter dated March 22, 2002, appellant advised Patient 1 that he could no longer serve as her psychiatrist. He stated, "It is with regret that I find it necessary to inform you that I am withdrawing further professional attendance upon you. The extent and magnitude of your problems are beyond the scope of my practice in Solon." After offering to assist her in transitioning to another psychiatrist, appellant stated, "I am sorry that I cannot continue as your psychiatrist. I hope that you will ultimately view our work together as helpful and meaningful. I extend best wishes to you for your future health and happiness." (State's Ex. 3.)
 {¶ 30} Appellant testified that he did not terminate his physician-patient relationship with Patient 1 earlier because:
Dismissing people isn't consistent with the kind of doctor I tried to be. Certainly, it would have been safer, but I really told myself, outside the heat of the moment, that I could control myself. I really believed that I could control myself. And that sending a person away because you were weak wasn't an appropriate thing to do. I should have gotten stronger. I should have sought help.
(Tr., 352.)
 {¶ 31} Later, appellant promised Patient 1 that he would confess to Dr. McGraw, that he would remove any reference in Patient 1's records about her being delusional, and that he would not kill himself. He then accompanied Patient 1 to a session with Dr. McGraw, where he admitted his conduct to Dr. McGraw.
 {¶ 32} Appellant testified that, following this disclosure, he told his wife about his conduct. His wife sought help for him with Dr. Steven B. Levine, M.D., who he has been seeing ever since. Appellant testified that Dr. Levine has helped him a great deal. At the hearing, appellant acknowledged that he had victimized Patient 1, and that his treatment of Patient 1 violated the standard that a psychiatrist owes to his patients. He stated that his conduct violated the Hippocratic Oath, the ethical rules of the American Medical Association and the American Psychiatric Association.
 {¶ 33} Patient 1 was hospitalized on October 30, 2002, and she described the reasons therefor as follows:
It was through therapy and trying to deal with [my relationship with Dr. Schechter], I realized what happened, that I was abused and exploited, and I just got angry, and I felt rage, and I just had to get help. I've never felt like that before, and it was directed at Dr. Schechter and I wanted — I still had feelings, very mixed feelings. * * *
The whole time it was exacerbated by my illness, my bipolarity. I was like on a roller coaster. It was up and down. I never knew what was going to happen. I was in love. I told him I don't know how many times. I didn't want to be with anyone but him. My husband, my marriage suffered. * * * [M]y work suffered. And * * * I don't know if I will ever get over this.
(Tr., 96.)
 {¶ 34} Patient 1's treating psychiatrist at that time, Brooke Wolf, M.D., recommended that Patient 1 seek hospitalization due to Patient 1's "acute agitation, mood lability, uncontrollable anger, impulsive behavior and rage that was becoming problematic." It was also noted that Patient 1 had been "engaging in having affairs and having strong impulses toward harming a previous psychiatrist."
 {¶ 35} When she presented to the emergency room at Lake Hospital West in Willoughby, Ohio, she was combative to the point that all four of her limbs had to be physically restrained, she was agitated and hallucinating, and her blood alcohol level was 0.042 gm/dl. Patient 1 reported that her uncontrollable anger was stimulated by her memories of the sexual abuse perpetrated by appellant. She was transferred to University Hospitals Health System, Laurelwood Hospital Counseling Centers in Willoughby, Ohio, and was discharged on November 6, 2002. (State's Ex. 11, at 9, 18-20.)
 {¶ 36} David Bienenfeld, M.D., testified at the hearing on behalf of the state. He received his medical degree in 1978 from the University of Cincinnati College of Medicine in Cincinnati, Ohio, completed an internship and residency in psychiatry in 1981, and a fellowship in geriatric psychiatry in 1982, all at the University of Cincinnati. He is currently a Professor of Psychiatry and Vice-Chair of the Department of Psychiatry at Wright State University School of Medicine. He also maintains a private practice. He is board-certified in general psychiatry.
 {¶ 37} He testified that appellant's encounters with Patient 1 went far outside the scope of the referral through which he became Patient 1's psychiatrist for purposes of medication management. He stated that, "there was much more of an intrusive investigation into elements of the patient's thoughts, feelings, behavior and past than would be necessary for medication management." He testified that he would have great difficulty describing appellant's conduct as psychotherapeutic. He stated that appellant violated the American Medical Association's Principles of Medical Ethics I, II and IV. He went on to explain:
The relationship between doctor and patient is inherently unequal. The doctor is always the more powerful figure of the two, and a sexual relationship between a physician and a patient is almost by its nature exploitative of the patient.
Beyond that, it clouds the physician's judgment about being able to make competent, accurate, proper medical decisions with regard to the patient. In the psychiatric realm, the issues are even more complex because patients will probably view their physicians through a kind of natural distortion of personal history, temperament, [and] current needs.
(Tr., 136.)
 {¶ 38} The hearing officer summarized another key portion of Dr. Bienenfeld's testimony thusly:
Dr. Bienenfeld added that, with a psychiatric patient, the patient's vulnerability is greater and the nature of the relationship tends to make possible more distortions. He explained that a psychotherapeutic relationship generally involves transference of the patient's personal history, current needs, and expectations to the psychiatrist. He explained that a patient with Patient 1's history would likely enter the therapeutic relationship with a pre-disposition to affection toward the psychiatrist. He added that the relationship between the psychiatrist and patient is part of the healing element of psychiatric therapy when handled properly. He stated that, `when that relationship becomes polluted by a sexual encounter, than [sic] what should be a therapeutic relationship becomes a destructive one.'
(Report of Hearing Officer, at 21-22.)
 {¶ 39} Dr. Bienenfeld testified that sexual contact between a psychiatrist and a patient is never within the standard of care, and that appellant's conduct fell below the minimum standards of care of similar practitioners under the same or similar circumstances. He testified that, when appellant told Patient 1 that she could do anything so long as she stayed in her chair, appellant had incorrectly paraphrased a tenet of psychotherapy known as the "rule of abstinence." This rule provides that, "a patient can say anything but not act." He added that, because the relationship between a psychiatrist and his or her patient is so intimate, the "rule of abstinence" is very important.
 {¶ 40} He further testified that when Patient 1 began to behave in a sexually demonstrative manner, appellant should have told Patient 1 that he would be unable to help her if she continued to behave that way. He should have then encouraged her to share her feelings with Dr. McGraw, and then directed the conversation back toward the purpose of her visits, which was medication management and the symptoms that the medications were targeting. Appellant also fell below the standard of care, according to Dr. Bienenfeld, when he failed to fully document the extent of the sexual content of his sessions with Patient 1, and when he failed to apprise Dr. McGraw of the same.
 {¶ 41} Dr. Bienenfeld characterized much of appellant's behavior toward Patient 1 as "self-serving and sometimes malicious," including appellant's threats toward Patient 1 and his lying to Dr. McGraw regarding his diagnosis that Patient 1 was delusional. Dr. Bienenfeld also testified that a reasonable practitioner should have and would have been aware that given her history of having been a victim of sexual abuse, Patient 1 was particularly vulnerable to her psychiatrist's sexual conduct toward her and with her. He stated that, "the behavior enacted under the guise of therapy was not appropriate for the patient's diagnosis and condition, nor for any patient." (State's Ex. 4.)
 {¶ 42} In addition to his own testimony, appellant offered the testimony of two other physicians, the aforementioned Dr. Levine as well as Gregory Alan Peterson, M.D. Dr. Levine received his medical degree in 1967 from Case Western Reserve University School of Medicine, and for 20 years worked within that institution's Department of Psychiatry. Since 1993, he has been engaged in the private practice of medicine at the Center for Marital and Sexual Health, specializing in relationship and sexual abnormality. Since the 1980s, the practice has operated a program for treating professionals who sexually offend during the course of their practice. Dr. Levine testified that one-half of his practice is devoted to general adult psychiatry and one-half is focused on sexual abnormality, including sexual identity, sexual offending behaviors, sexual dysfunction and marital problems.
 {¶ 43} Dr. Levine first met appellant in 2002 when appellant's wife contacted him and reported that appellant was planning to kill himself. Since that time, appellant has met with Dr. Levine weekly for therapy sessions. Dr. Levine described the focus of these therapy sessions as helping appellant to deal with his "technical incompetence" in dealing with Patient 1. (Tr., 407-408, 450.) Dr. Levine testified that Patient 1's behavior toward appellant is what is known as "eroticized transference." He described this behavior as follows:
[Patient 1] was relentless in her insistence that she loved him, [that she] wanted to have sex with him, and intended to do everything in her power to bring that about. Despite Dr. Schechter's repeated refusals and attempts to redirect her to more productive use of their time together, he succumbed to her unrelenting barrage of letters and fantasies about what she sexually wanted to do with him, and seductive displays of her underwear, anatomy, and sexual excitement.
(Respondent's Ex. B.) Dr. Levine testified that it is very difficult to deal appropriately with eroticized transference, and further that most psychiatrists never experience eroticized transference in the course of their practice. (Tr., 402-403, 453.)
 {¶ 44} Dr. Levine testified that roughly one-half of practicing psychiatrists would have terminated Patient 1's treatment, finding the same would be fruitless, and that the other half would not have terminated Patient 1's treatment because they would believe that abandoning such a patient "in the midst of her acting out this center of her pathology" would be detrimental to her. Ideally, though, he concluded, appellant should have consulted with Dr. McGraw or with a psychiatrist who had experience with eroticized transference, once appellant decided to continue treating Patient 1.
 {¶ 45} Dr. Levine testified that he encouraged appellant to return to psychotherapy, and to treat all types of patients, including women. He stated that appellant has the intellect and motivation to use his own experience to teach others about boundary crossing. When asked whether appellant had harmed Patient 1, Dr. Levine would say only that Patient 1 was very sick, and that, "[t]he harm that came to Patient 1 is that, at the end of this relationship, it was clear that no great accomplishment came as a result of the years working with Dr. Schechter." (Tr., 424.)
 {¶ 46} Gregory Alan Peterson, M.D., also testified on behalf of appellant. Dr. Peterson is the Director of Clinical Services for Community Support Services, Inc., in Akron, Ohio. He received his medical degree from the Ohio State University College of Medicine in 1978. He testified that Community Support Services, Inc., is a large practice that treats nearly 3,000 patients and employs 14 psychiatrists, including appellant. Dr. Peterson testified that Community Support Services, Inc., has employed appellant for the past five years and that Dr. Peterson is appellant's supervisor. He recounted that when appellant informed him of the situation involving Patient 1, in the fall of 2002, appellant showed a great deal of remorse and self-criticism. Dr. Peterson stated that he endeavored to determine whether the situation involving Patient 1 was an isolated incident or whether appellant had engaged in any similar conduct with Community Support Services, Inc. clients. He concluded that the inappropriate conduct with Patient 1 was an isolated case. (Tr., 284-286.)
 {¶ 47} Dr. Peterson opined that appellant engaged in this inappropriate conduct with Patient 1 because appellant's pride prevented him from seeking help when he found himself in a situation he was unable to handle. He further testified that the leadership at Community Support Services, Inc., decided not to impose any discipline upon appellant in relation to his conduct with Patient 1. He stated that he felt comfortable that appellant was not a threat to clients and that appellant had continued to practice with the agency without direct supervision or other limitations or safeguards being imposed. On cross-examination, Dr. Peterson admitted that he probably would not have hired appellant had he known about appellant's conduct with Patient 1.
 {¶ 48} Upon consideration of all of the foregoing evidence, the hearing officer made findings of fact and conclusions of law consistent with the state's presentation of evidence and the charges listed in the May 14, 2003 notification letter that the board sent to appellant. The hearing officer proposed the permanent revocation of appellant's license to practice medicine and surgery, noting, "Dr. Schechter's clear disregard for the welfare of this patient affords this Board little choice but to permanently revoke his license to practice medicine and surgery in this state." (Report and Recommendation, at 31.)
 {¶ 49} Appellant filed objections to the Report and Recommendation and requested permission to address the board. An excerpt from the draft minutes of the board's March 10, 2004 meeting indicates that all board members received and read copies of the Report and Recommendation and the objections. The board permitted appellant to address the board for five minutes.
 {¶ 50} During his address to the board members, appellant expressed regret for his conduct and acknowledged that his "incompetence" caused his family and Patient 1 to suffer. Appellant told the board that he has learned many things from this incident and that he has turned his life around. He stated that he has closed his private practice, worked with Dr. Levine, changed his clinical focus, discussed his situation candidly with his supervisors and colleagues, and cooperated with the board's investigation. He stated that he feels he still has a place in the practice of medicine and that he believes that he is a competent, safe and compassionate physician. He expressed a desire to share his experience regarding treating Patient 1 in order to teach others about how to avoid boundary violations with patients. He emphasized that he has successfully treated hundreds of patients in the time since he admitted to his conduct with Patient 1, and that he continues to enjoy the support of colleagues and supervisors.
 {¶ 51} In response, Assistant Attorney General Wilcox urged the board to permanently revoke appellant's license to practice medicine. He argued that appellant abused a very vulnerable patient over a substantial period of time, and did so knowing that she had been the victim of years of abuse as a child. The excerpt of the board's minutes further memorialized Mr. Wilcox's remarks as follows:
Mr. Wilcox stated that * * * Dr. Schechter used this patient as his personal sex toy. He admittedly allowed her to perform exhibitionist sexual acts for him on at least 36 different occasions. Mr. Wilcox stated that Dr. Schechter encouraged this behavior by telling the patient that she could do whatever she wanted, as long as she remained in the chair. Dr. Schechter could have easily ended this behavior by simply telling the patient that such behavior was unacceptable, and that, if she continued it, he would no longer treat her. Dr. Schechter didn't do that, and that's the crux of the issue. He didn't want her to stop. Dr. Schechter knowingly abused this patient for months.
* * * Dr. Schechter allowed this patient to masturbate in his presence on at least 36 occasions. He then had sex with this patient, knowing that it would cost him his career and his license to practice. He then emotionally abused her, attempting for months to cover up his acts, only deepening the damage he did to this patient. Additionally, in an argument outside of his office, Dr. Schechter physically slapped this patient.
Mr. Wilcox stated that Dr. Schechter should never be allowed to put any other patient in such danger. * * *
(Excerpt from Draft Minutes of March 10, 2004, at 4.)
 {¶ 52} Assistant Attorney General Perry also spoke. He argued that appellant's claims that his conduct with Patient 1 was due to his technical incompetence is "totally irrelevant in this case." (Ibid.) He continued:
This case isn't here because Dr. Schechter didn't have the ability to make this person get better. It's here because, whatever his ability level, he should have stopped this atrocity from ever happening.
* * * Dr. Schechter claims that he has learned a lesson from his experience in this case. This was not a gray area. There was no judgment call here. The rule against having sex with a patient is as black and white as black and white can be. * * * The risk of patient harm is unmistakable, and that's not something that Dr. Schechter needed to learn. He already knew that. It shouldn't have taken any special ability or expertise on his part just to say, `no, we're not going there.'
(Id. at 4-5.)
 {¶ 53} The excerpt from the draft minutes also contains the discussion in which the board members engaged prior to rendering their decision:
Dr. Steinbergh stated that this case was probably the most difficult, most egregious she has had to read in the 11 years she's been on the Board. * * * [S]he's pleased to know that Dr. Schechter has handled his personal life to his satisfaction. She added, however, that Dr. Schechter needs to know that the Board's mission is one of public protection, and there are certain acts so egregious by physicians, so severe, that this Board cannot accept those acts. It's absolutely intolerable. There was so much harm to this patient, and there were so many chances not to harm this patient, and he continued with it.
Dr. Steinbergh stated that Mr. Wilcox' reply today absolutely reflects her thoughts in this case. There is no question in her mind that this license has to be permanently revoked.
Dr. Robbins agreed with Dr. Steinbergh and stated that the Assistant Attorneys General put it very well. These instances of `whatever happens in the chair, as long as she stays in the chair,' are just atrocious, and in his mind this wasn't psychotherapy. This was a peeping Tom. There's no place in medicine for something like this, and permanent revocation is the only penalty.
Dr. Bhati stated that the whole thing described in the Report and Recommendation and by the two Assistant Attorneys General speaks on its own. Imagine 36 counts of masturbation sitting in the office, going for months having sex.
What else can go wrong here? Dr. Bhati stated that it has to be permanent revocation in plain, simple form, and nothing else.
Dr. Egner also spoke in agreement. She stated that there aren't many times before this Board where there is a single patient involved and the Board has revoked a license. The thing considered when that happens is that the action itself is so egregious that it doesn't matter that it is just one patient. This was definitely one patient over many, many times in many years so, in a sense, although it's a single patient, it's not necessarily a single act.
Dr. Egner continued that the Board has to take into consideration Dr. Schechter's specialty, psychiatry. She stated that she likens it, many times, to impairment cases when anesthesiologists are involved. The Board sees them in a little different light than it does the other specialties because they have such easy access to drugs. It makes their situation a little different from some of the other specialties. In the same sense, a sexual abuse case in relation to psychiatry is the worst situation you can have. The Board doesn't have a way to monitor him when he is alone with patients. There is no such thing as a third party in a room with a psychiatrist. That in itself limits the Board's ability to know that this won't happen again.
* * *
Dr. Buchan stated that to Dr. Schechter's credit, he appreciated Dr. Schechter's disclosure. Dr. Buchan stated that the Board is so used to seeing records full of conflicting reports and lies and deceit. Dr. Schechter makes no mistake about what he did. Dr. Buchan stated that he hopes that this is the beginning of a better life for Dr. Schechter, noting that it wasn't working so well before. Dr. Buchan stated that he will vote for revocation in this case, but hopes that Dr. Schechter continues to stay on track.
Mr. Browning stated that, from a consumer perspective, if the Board didn't revoke this license, he doesn't know a case where it could. This was beyond any standard of decency, and it goes way beyond incompetence, in his judgment, for Dr. Schechter to knowingly pursue that course of action. Mr. Browning stated that the Board is compelled to vote to permanently revoke. He also agrees with Dr. Buchan that this is a tragedy for the doctor and the patient. Hopefully, Dr. Schechter can find a better way going forward, but he Board has to revoke.
(Id. at 5-7.)
 {¶ 54} Following their discussion, all seven non-abstaining members of the Board voted to approve and confirm the hearing officer's proposed findings of fact, conclusions of law, and order of permanent revocation. Appellant timely appealed the board's order to the Franklin County Court of Common Pleas, which affirmed the order, finding that the same was supported by reliable, probative, and substantial evidence. Thereafter, appellant appealed to this court.
 {¶ 55} Before turning to the substantive issues raised in appellant's assignments of error, we call to mind the appropriate standard of review that guides our disposition thereof. In an administrative appeal pursuant to R.C. 119.12, the trial court reviews an order to determine whether it is supported by reliable, probative, and substantial evidence, and is in accordance with the law. Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83, 87, 19 OBR 123, 482 N.E.2d 1248; Rossiter v.State Med. Bd. of Ohio, 155 Ohio App.3d 689, 2004-Ohio-128,802 N.E.2d 1149, at ¶ 11. Reliable, probative, and substantial evidence has been defined as follows:
* * * (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.
Our Place, Inc. v. Ohio Liquor Control Comm. (1992),63 Ohio St.3d 570, 571, 589 N.E.2d 1303.
 {¶ 56} On appeal to this court, the standard of review is more limited. Unlike the court of common pleas, this court does not determine the weight of the evidence. Rossford ExemptedVillage School Dist. Bd. of Edn. v. State Bd. of Edn. (1992),63 Ohio St.3d 705, 707, 590 N.E.2d 1240. In reviewing the court of common pleas' determination that the commission's order was supported by reliable, probative, and substantial evidence, this court's role is limited to determining whether the court of common pleas abused its discretion. Roy v. Ohio State Med. Bd.
(1992), 80 Ohio App.3d 675, 680, 610 N.E.2d 562. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. However, on the question of whether the commission's order was in accordance with the law, this court's review is plenary. Univ. Hosp., Univ. of CincinnatiCollege of Medicine v. State Emp. Relations Bd. (1992),63 Ohio St.3d 339, 343, 587 N.E.2d 835.
 {¶ 57} In his first assignment of error, appellant argues that the trial court abused its discretion in failing to vacate the board's order because the order is based upon "false evidence" and is not supported by reliable, probative and substantial evidence. The sole basis of appellant's argument under this assignment of error consists in his contention that the board members based their decision on mischaracterizations of the evidence first made by Assistant Attorney General Wilcox and echoed by some of the board members.
 {¶ 58} Our review of appellant's briefs filed with this court reveals that he does not argue that the factual findings placed in the hearing examiner's report and adopted by the board are unsupported by reliable, probative, and substantial evidence. He also does not argue that the evidence adduced at the hearing fails to demonstrate that appellant did all of the acts charged in the board's May 14, 2003 letter. Rather, he argues that some of the board members' comments reveal that they based their votes upon misunderstandings and mischaracterizations of the evidence, and that, as such, the board's order is not based upon reliable, probative, and substantial evidence and is contrary to law.
 {¶ 59} Appellant directs our attention to several specific items in the record. First, Drs. Robbins, Steinbergh and Bhati all expressed agreement with the characterization of the facts offered by Assistant Attorney General Wilcox during his summation. As part of his argument, attorney Wilcox stated, "Dr. Schechter allowed this patient to masturbate in his presence on at least 36 occasions." (Excerpt of Draft Minutes of March 10, 2004, at 4.) Later, Drs. Steinbergh and Robbins expressed their agreement with the way in which the assistant attorneys general had stated the case. Dr. Bhati then commented, "Imagine 36 counts of masturbation sitting in the office, going for months having sex. What else can go wrong here?" (Excerpt from Draft Minutes of March 10, 2004, at 6.)
 {¶ 60} Appellant points out that there were not 36 instances of masturbation. When he was questioned about this at the hearing, he explained that the 36 instances did not all involve masturbation per se; rather, Patient 1's activities during these 36 instances ranged from varying degrees of disrobing to self-stimulation. Appellant stated, "I think masturbation is a strong term. She would touch herself, but she did not have an orgasm in my office, and I would attempt to redirect her. So the episodes of self-stimulation were limited." (Tr., 37.) Appellant also points out that, by all accounts, there was only one instance of intercourse/fellatio between appellant and Patient 1, and that he was not "going for months having sex."
 {¶ 61} Appellant argues that the board members' comments "demonstrate that they believed certain `facts' to be part of the record, when they were not." (Brief of appellant, at 13.) He argues that the foregoing comments of some of the board members, and the fact that the other members failed to correct these misstatements, demonstrate that the board members "believed that permanent revocation was necessary and appropriate because of the false statements." He contends that the board's order was not based on the facts adduced, but on false interpretations of the facts, and that this violates his right to due process of law and the basic principle of fairness upon which the Administrative Procedure Act is based.
 {¶ 62} Upon our examination of the entire record, including all of the board members' comments, we conclude that the administrative hearing that led to appellant's license revocation comported with the requirements of fairness and due process. We note initially that at the commencement of the board's March 10, 2004 meeting, all board members acknowledged that they had "received, read, and considered the hearing record, the proposed findings, conclusions, and order, and any objections filed in [appellant's case]." (Id. at 1.) Thus, the members were fully apprised of the evidence adduced at appellant's hearing.
 {¶ 63} It is true that Dr. Bhati misstated the evidence with respect to the nature of all 36 instances of exhibitionism involving Patient 1, and did so also with respect to the number of times appellant had sexual relations with Patient 1. However, there is reliable, probative, and substantial evidence in the record that substantiates all of the charges against appellant and supports the penalty imposed by the board, sufficient to outweigh appellant's claims of prejudice from Dr. Bhati's misstatement of the evidence. See Clayman v. State Med. Bd. ofOhio (1999), 133 Ohio App.3d 122, 128, 726 N.E.2d 1098.
 {¶ 64} The evidence undisputedly demonstrates that appellant allowed Patient 1 to expose herself to him, listened to her sexual fantasies involving him, and allowed Patient 1 to rub her genitals in his presence, all as charged in allegation number two of the board's May 14, 2003 letter. The evidence also demonstrates that appellant touched Patient 1's panties on one occasion, as charged in allegation number three of the board's letter, and that appellant engaged in sexual relations with Patient 1 during a psychiatric session on April 17, 2000, as charged in the same paragraph. Finally, the evidence overwhelmingly establishes, and appellant admitted, that after he had sexual relations with Patient 1 he continued to treat her for approximately two more years; inappropriately discussed his personal feelings with Patient 1, including the consequences of her revealing his conduct; told her that he would deny that any such conduct had occurred; and slapped Patient 1 in the face, all as charged in allegation number four of the board's letter.
 {¶ 65} With all of the foregoing allegations having been established, we fail to see, and appellant fails to satisfactorily explain, why it is consequential that Dr. Bhati believed that the evidence revealed multiple instances of sexual intercourse rather than just one, or why the board's order should be vacated because Dr. Bhati believed that Patient 1 actually masturbated on all 36 occasions of exhibitionism that appellant admittedly allowed to occur during his treatment sessions with Patient 1.
 {¶ 66} With respect to the disputed "36 instances," Assistant Attorney General Wilcox told the board that Dr. Schechter "admittedly allowed [Patient 1] to perform exhibitionist sexual acts for him on at least 36 occasions." He later said, "* * * Dr. Schechter allowed this patient to masturbate in his presence on at least 36 occasions." Viewed as a whole, we do not think that attorney Wilcox so mischaracterized the evidence that his summation prejudiced appellant's right to a fair hearing and to the protections of due process. As we previously noted, the board members had reviewed the entire record and the hearing examiner's report prior to hearing from Mr. Wilcox. The record contains uncontroverted evidence that appellant allowed Patient 1 to disrobe and/or touch herself erotically, to varying degrees, during what were supposed to be therapeutic medication management appointments. Regardless of the degree of accuracy with which attorney Wilcox restated it during his argument, this is the true essence of the undisputed evidence that was before the board.
 {¶ 67} As for Drs. Steinbergh and Robbins, these board members expressed much more than simple agreement with the assistant attorney generals' statements. As we noted earlier, Dr. Steinbergh called this case the "most egregious she has had to read in the 11 years she's been on the Board." (Excerpt from Draft Minutes of March 10, 2004, at 5.) Immediately thereafter, she stated that "[t]he Board has read the record and had time to give thought to it, and listening to what has been said * * * [but] Dr. Schechter needs to know that the Board's mission is one of public protection, and there are certain acts so egregious by physicians, so severe, that this Board cannot accept those acts. It's absolutely intolerable." (Ibid.)
 {¶ 68} Dr. Robbins focused his comments primarily upon appellant's rule for his sessions with Patient 1 of "`whatever happens in the chair, as long as she stays in the chair,'" and called this "just atrocious[.] * * * [I]n his mind this wasn't psychotherapy. This was a peeping Tom. There's no place in medicine for something like this, and permanent revocation is the only penalty." (Id. at 6.)
 {¶ 69} Moreover, the other board members were not simply silent as to the facts of record, as appellant contends. Dr. Egner stated that conduct involving a single patient rarely culminates in revocation, but that appellant's conduct was so egregious that it warrants such a sanction. Dr. Egner also emphasized that appellant's practice area of psychiatry renders board oversight virtually impossible because he must be alone with his patients in order to treat them. She compared appellant's case to cases in which anesthesiologists, whose practice necessitates access to drugs, are before the board on substance-related impairment issues. But she noted that, "a sexual abuse case in relation to psychiatry is the worst situation you can have * * * [because] [t]here is no such thing as a third party in a room with a psychiatrist." (Ibid.)
 {¶ 70} Finally, board member Browning, who represents the interests of consumers on the board, stated that, "if the Board didn't revoke this license, he doesn't know a case where it could." (Id. at 7.)
 {¶ 71} It is clear from the record that the evidence of appellant's misconduct is overwhelming. It is also clear that the board members were aware of the nature and substance of all of the evidence and testimony, and based their decision thereon. Thus, the board's order adopting the findings of the hearing examiner and permanently revoking appellant's license to practice medicine was not contrary to law and was supported by the requisite quantum of reliable, probative, and substantial evidence. Accordingly, appellant's first assignment of error is overruled.
 {¶ 72} In support of his second assignment of error, appellant argues that his right to due process of law was violated because the board's imposition of permanent revocation was "grossly excessive" and is unreasonably and arbitrarily disproportionate to the sanctions imposed in similar cases.
 {¶ 73} For support of this contention, appellant relies on the case of Brost v. Ohio State Med. Bd. (1991),62 Ohio St.3d 218, 581 N.E.2d 515. Curiously, appellant relies on Brost to support his argument that the board should have viewed his case in light of its actions in other cases, and that it violated his right to due process because the sanction it imposed upon him "departed wildly from the standards stated and processes followed in all prior similar case precedent, resulting in a violation of due process." (Reply Brief of Appellant, at 8.) But the court inBrost vacated a board order because it was questionable whether the board had felt compelled to impose a particular sanction in accordance with non-statutory "guidelines" that had never been promulgated as an administrative rule, and had failed to consider other sanctions.
 {¶ 74} Put another way, Brost stands for the proposition that the board must evaluate each disciplinary action on a case-by-case basis. Indeed, R.C. 4731.22(B) requires the board to address each disciplinary matter on a case-by-case basis.Clayman v. State Med. Bd. of Ohio (1999), 133 Ohio App.3d 122,129, 726 N.E.2d 1098.
 {¶ 75} The majority in Brost stated, in dicta, that when the General Assembly granted the board a broad spectrum of sanctions from which to choose in disciplining physicians it "* * * intended that the sanction selected by the board be proportionate to the prohibited act or acts committed by the doctor." Id. at 221. Appellant contorts this language in support of his contention that the board is required to conduct a proportionality inventory of all sexual abuse-related disciplinary cases each time it considers a sanction in such a case, and that the court of common pleas must conduct some sort of proportionality review of the board's decision. We find a dearth of support for this argument and reject it as wholly contrary to the express language and intent of R.C. 4731.22.
 {¶ 76} In light of the overwhelming evidence that appellant allowed a psychiatric patient to engage in sexual acting out during what were supposed to be therapeutic medication management sessions, that he engaged in sexual relations with the patient, that he continued to treat her afterward, and that he threatened her with reprisals if she revealed his actions, it cannot be said that the board's order is disproportionate to the prohibited acts committed by this doctor. The board clearly obeyed its statutory mandate to evaluate appellant's case — standing alone — on the evidence of record therein. Accordingly, we perceive absolutely no violation of Brost in this case.
 {¶ 77} Moreover, the record reveals that the board members acknowledged that, "the disciplinary guidelines do not limit any sanction to be imposed, and that the range of sanctions available in each matter runs from dismissal to permanent revocation." (Excerpt from Draft Minutes of March 10, 2004 Board Meeting, at 1.) This court has twice rejected Brost-based arguments like appellant's when the record contained language identical to that quoted hereinabove, which indicated that the board acknowledged that its disciplinary guidelines did not limit it to any particular sanction, and that it considered the full range of sanctions authorized by R.C. 4731.22(B). See Ross v. State Med.Bd. of Ohio, 10th Dist. No. 03AP-971, 2004-Ohio-2130;Bouquett v. State Med. Bd. of Ohio (1997), 123 Ohio App.3d 466,704 N.E.2d 583.
 {¶ 78} When the board's order is supported by reliable, probative, and substantial evidence and is in accordance with law, a reviewing court may not modify a sanction authorized by statute. Henry's Cafe, Inc. v. Ohio Bd. of Liquor Control
(1959), 170 Ohio St. 233, 10 O.O.2d 177, 163 N.E.2d 678; Merrittv. Ohio Liquor Control Comm., 10th Dist. No. 02AP-709, 2003-Ohio-822, at ¶ 34. The board is authorized to revoke appellant's license to practice medicine in Ohio for "[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established," R.C. 4731.22(B)(6), and for "violation of any provision of a code of ethics of the American medical association." R.C. 4731.22(B)(18). Because the board's sanction was authorized by statute, the trial court could not order modification of the penalty imposed. Henry's Café, Inc.,
supra; Ross, supra, at ¶ 14.
 {¶ 79} For all of the foregoing reasons, appellant's second assignment of error is overruled.
 {¶ 80} Having overruled both of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Brown, P.J., and Petree, J., concur.